**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**RODNEY P. PIERCE,**

      **Plaintiff,**

**v.**                                  **Civil Action No.: 5:14-CV-37
(JUDGE STAMP)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

On March 19, 2014, Plaintiff Rodney P. Pierce ("Plaintiff"), by counsel Jan Dils, Esq.,

filed a Complaint in this Court to obtain judicial review of the final decision of Defendant

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"),

pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl.,

ECF No. 1). On May 21, 2014, the Commissioner, by counsel Helen Campbell Altmeyer,

Assistant United States Attorney, filed an answer and the administrative record of the

proceedings. (Answer, ECF No. 8; Admin. R., ECF No. 9). On June 18, 2014 and July 18, 2014,

Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s

Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 13; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF

No. 14). On July 30, 2014, Plaintiff filed a Reply to Defendant's Brief. (Pl.'s Reply, ECF No.

16). Following review of the motions by the parties and the administrative record, the

undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  PROCEDURAL HISTORY

On September 27, 2011, Plaintiff filed his first application under Title II of the Social Security Act for Disability Insurance Benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"). (R. 16, 30). Plaintiff's first claims were denied at all intra-agency adjudicatory levels: initially on December 2, 2011; upon reconsideration on March 1, 2012; following a hearing held on July 2, 2012 and by resulting decision by Administrative Law Judge ("ALJ") Jeffrey P. La Vicka on July 12, 2012; and by the Appeals Council on November 28, 2012. (R. 16, 30).

On December 19, 2012, Plaintiff reapplied for DIB and SSI alleging disability that began on July 24, 2012, due to dermatomyositis, insomnia, osteoarthritis and acid reflux. (R. 131). The claims were denied initially on February 15, 2013 (R. 75) and denied again upon reconsideration on March 21, 2013 (R. 84). On April 4, 2013, Plaintiff filed a written request for a hearing (R. 87) and requested that the hearing be expedited due to dire financial need (R. 91), which was granted on May 20, 2013 (R. 105). The hearing was held before ALJ George A.  Mills, III on September 10, 2013 in Morgantown, West Virginia. (R. 106, 548). Plaintiff, represented by counsel, Ambria Adkins, Esq., appeared and testified, as did Irene Montgomery, an impartial vocational expert. (R. 548). On September 19, 2013, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 13-26). On January 27, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 7).

## III. BACKGROUND

### A.  Personal History

Plaintiff was born on July 8, 1969 and was forty-four (44) years old at the time of the

2013 administrative hearing before ALJ Mills. (R. 131). Plaintiff was divorced and the custodial parent of three children, ages five, seven and seventeen. (R. 558). Plaintiff testified he graduated from high school and obtained a license for pest control. (R. 560). Plaintiff worked for Terminix in the pest control industry since 1996. (R. 563). In 2011, Plaintiff worked as a sales inspector, which required crawling in attics and crawl spaces in order to inspect the house. (R. 562). Plaintiff was eventually fired from this position in 2011 because he could not fulfil his duties based on needing to take half days due to his medical conditions. (R. 561-62). In regard to his current finances, Plaintiff stated he receives child support, food stamps, assistance from charity and uses a medical card. (R. 189-90, 559).

**B.    Medical History**

ALJ Mills found Plaintiff suffered from the following impairments: polyarthritis; osteoarthritis of the knees with history of anterior cruciate ligament and knee cartilage surgeries; history of right rotator cuff/shoulder surgery; dermatomyositis; inflammatory myopathy; mood disorder associated with medical condition (dermatomyositis); and generalized anxiety disorder. (R. 19). Even though the ALJ made findings regarding Plaintiff's physical and mental impairments, Plaintiff only raised one narrow issue in his brief: the ALJ's evaluation of Plaintiff's mental impairment and resulting functional limitations. Accordingly, while the undersigned reviewed all of the medical evidence of record, the following discussion of facts is limited to records pertaining to Plaintiff's mental impairments.

**1.   Medical Evidence**

The administrative record included the following medical evidence: Lauderman Clinic physical therapy notes from December 2009 to December 2010; Affiliated Physical Therapy Services in February and March 2011; United Hospital Center laboratory tests, imaging studies

and treatment from June 2012 to July 2013; Clarksburg Surgical Specialists in August 2012; Mountain State Rheumatology from July 2012 to September 2013; Health Access, Inc. in November and December 2012; United Orthopedics from May 2012 to May 2013; UHC Family Medical Center from February 2013 to June 2013; Mon General Hospital in March 2013; Oncology Hematology Associates in April and June 2013; and Associated Specialists from March 2013 to August 2013. After thoroughly reviewing these medical records, the undersigned notes that Plaintiff's general physical examinations routinely stated that Plaintiff was alert and oriented to time, place and person and in no acute distress, his mental status examinations were noted as normal and his neurologic evaluations positively intact. The record does not contain any notes indicating Plaintiff received behavioral health treatment from a mental health provider.

While the record does not include specific mental health treatment, Plaintiff's treating physicians occasionally documented Plaintiff's mental status during his appointments. These specific references as to mental health or mental status are included below:

On February 26, 2013, Plaintiff had an appointment at UHC Family Medicine Center with Dr. Tarum Kumar, MD. (R. 283). When reviewing Plaintiff's systems, Dr. Kumar noted negative psychiatric/behavioral issues and specifically stated "negative for depression." (R. 284). On April 15, 2013, Plaintiff had a follow-up appointment and the examination noted normal mood and affect in regard to his psychiatric status. (R. 288).

On March 5, 2013, Plaintiff presented for an appointment with Dr. Faisal Bukeirat for a gastrointestinal follow-up for his abdominal pain, GERD and hemorrhoids. (R. 342). The review of systems noted for psychiatric: "no recent history of anxiety, depression, memory loss or suicidal thoughts." (R. 342).

On March 27, 2013(R. 298), April 24, 2014 (R. 299), June 12, 2013 (R. 301), July 12,

2013 (R. 303), August 16, 2013 (R. 389), Plaintiff presented for appointments with Dr. Adnan Alghadban, M.D. at Associated Specialists Inc. for treatment of his occipital headaches with occipital nerve blocks and his shoulder pain with joint injections. Upon physical examination, Dr. Alghadban noted "normal mental status" during each appointment. (Id.). Treatment notes from July 12, 2013 indicate that Plaintiff's current medications list included Cymbalta. (R. 304).

The undersigned only found one instance in the record where a treating physician diagnosed Plaintiff with depression. On June 25, 2013, Plaintiff had an appointment with Dr. Tarum Kumar, M.D. at UHS Family Medicine Center for moderate pain all over in his muscles and bones. (R. 354). Plaintiff's medication list included 30 mg Cymbalta at this time, to be taken once a day for a week and then two times a day after that. (R. 355). The review of systems noted Plaintiff was positive for malaise/fatigue, myalgias and depression. (Id.). The physical examination noted Plaintiff's psychiatric condition to be "mild depressed mood." (Id.). His diagnoses at this time included "Depressed Mood" and Dr. Kumar noted: "[d]iscussed addition of [C]ymbalta for both mood and pain. Pt wants to discuss with Dr. Kafka. Will follow up." (Id.).

On August 27, 2013 (R. 526) and September 5, 2013 (R. 528), Plaintiff had appointments with Dr. Kafka at Mountain State Rheumatology and his current medication list included 60 mg of Cymbalta to be taken once a day.

### 2. Medical Reports and Opinions

The record does not include any treating source opinions or notations regarding limitations or restrictions by any treating physician. (R. 597). However, the record does include examinations and reports by State agency consultants:

**a. Mental Status Examination by Peggy J. Allman, M.A., West Virginia Disability Determination Service, February 7, 2013**

Peggy J. Allman, M.A., a licensed psychologist, prepared a Mental Status Examination of Plaintiff on February 7, 2013. (R. 208-10). In preparing the assessment, Ms. Allman's review of records only included a note from Mountain State Rheumatology dated November 5, 2012 indicating a diagnosis of dermatomyositis. (R. 208). Ms. Allman further noted that Plaintiff has never been involved in the mental health system. (Id.).

At the appointment, Plaintiff had a positive attitude and was cooperative. (R. 207). He stated he was applying for benefits because he has dermatomyositis, trouble sleeping and autoimmune disease. (R. 207). He stated that the disease "ate" sixty percent of his shoulder and forty percent of his legs. (Id.). He was diagnosed in 2011 and placed on short-term disability. He attempted to return to work in 2011 but was unable to perform his duties and was fired. (Id.).

His presenting symptoms included poor appetite, weight gain due to medication, crying "a lot" and "awful" energy level. (R. 207-08). He described his mood over the past two weeks as "depressed" and "very irritable." (R. 208). He reported suicidal ideation, which is mediated by his children. (Id.). He did not report symptoms consistent with phobias, panic attacks, obsessive-compulsive disorder, post-traumatic stress disorder, ADHD or bipolar disorder. (Id.). Plaintiff explained that he has been depressed after the onset of his physical problems, combined with a divorce. (Id.). He has avolition and anhedonia. (Id.). He stated that he has always been anxious and a worrier; he feels jittery and like his mind is racing and noted that these symptoms have increased since the onset of his disease. (Id.).

His medical history included hospitalization for right shoulder surgery, left and right knee and hernia repair. (Id.). His main illness is dermatomyositis, an immune system disorder, for which he is prescribed numerous medications. (Id.). Plaintiff stated that he does not use tobacco, alcohol or drugs and drinks less than sixteen ounces of caffeinated beverages a day. (Id.).

The mental status examination showed Plaintiff to be casually and cleanly dressed with good hygiene and grooming. (Id.). Ms. Allman made the following findings:

> His interaction with the examiner was within normal limits with good eye contact and adequate[] length of verbal responses. He did not demonstrate a sense of humor but was spontaneous and could carry the conversation. His speech was relevant and coherent with good pace. He was oriented x4. His mood was depressed with flat affect, there was no evidence of disturbance of thought processes, thought content, nor perception. Insight was within normal limits. Judgment, as measured by what he should do if would [sic] find an envelope that was sealed, stamped, and addressed?, was within normal limits. Suicidal ideations was reported to be mediated by the children and not reported currently. Homicidal ideation was denied. Immediate memory was mildly deficient and recent memory was within normal limits with three of the four words recalled correctly. Concentration, as measured by serial 7's was within normal limits. There was no psychomotor behavior.

(R. 209). Plaintiff's Axis I diagnoses were Mood Disorder Associated with Medical Condition, Dermatomyositis, and Generalized Anxiety Disorder. (Id.). Ms. Allman explained her diagnostic rationale:

> Mr. Pierce indicated that prior to the onset of his physical conditions, he had been anxious, most of his life. He has mind racing, worries excessively, and feels jittery most of the time. These symptoms have increased with the onset of his physical limitations. He experiences depression with difficult with sleep, low energy, avolition, anhedonia, crying and sadness, with the symptoms beginning with the medical problems. His affect was flat and he did not demonstrate a sense of humor during the interview.

(Id.). Ms. Allman found that Plaintiff's prognosis was "poor." (Id.).

Ms. Allman reviewed Plaintiff's daily activities, which included waking up, brushing his teeth, having coffee, taking a shower, eating food in order to take medication and watching television. (Id.). He resides with his three children over which he has shared custody. (Id.). He is able to care for his own hygiene and can cook "simple" things. (Id.). He can wash clothes with assistance. (Id.). He is unable to repair things, shops "a little" and drives. (Id.). He does not eat out and has no hobbies despite being very active prior to the onset of his condition. (Id.).

In regard to social functioning, Plaintiff's interaction with the examiner was within normal limits but Plaintiff stated that he is not socially involved with anyone, including groups, organizations or church. (Id.). His concentration, persistence and pace were within normal limits. (R. 209-10). His immediate memory was mildly deficient and his recent memory was within normal limits with three of the four words recalled correctly. (Id.).

### b. Disability Determination Explanation by G. David Allen, Ph.D., February 14, 2013

David Allen, Ph.D., State agency consultant, prepared the Disability Determination Explanation at the Initial level. (R. 462). Dr. Allen reviewed the medical evidence of record, including Ms. Allman's consultative examination, Plaintiff's treatment notes, the prior ALJ's decision and Plaintiff's activities of daily living. (R. 463-64). Dr. Allen found Plaintiff to have severe medical determinable impairments of polymyositis, dermatomyositis and other disorders of gastrointestinal systems. (R. 467). He specifically found Plaintiff's affective disorder and anxiety disorder to be non-severe. (R. 467).

Dr. Allen then completed a Psychiatric Review Technique (PRT) in which he found that a medical determinable impairment for Listing 12.04 Affective Disorder and Listing 12.06 Anxiety-Related Disorder do not precisely satisfy the "A" Criteria of the Listings. (R. 467). In regard to the "B" Criteria for both 12.04 and 12.06, he found no restrictions of activities of daily living, mild difficulties in maintaining social functioning, concentration, persistence or pace, and no repeated episodes of decompensation. (R. 467). As for the "C" criteria, Dr. Allen found that the evidence "does not establish the presence of the 'C' criteria." (R. 467). He further noted that "[d]irect observation of key functional capacities finds no more than mild limitation." (R. 468).

As for his credibility, Dr. Allen noted that for his "psych" conditions, the "degree of

limitation not completely confirmed at CE." (R. 468). As for weighing opinion evidence, Dr. Allen noted that he reviewed the 2012 ALJ Decision, which he gave great weight but noted with regard to "psych" that the "current case differs from ALJ in severity assessment. Current evidence suggests no more than mild functional limitation." (R. 469).

### c. Psychiatric Review Technique by Frank Roman, Ed.D, Medical Consultant, March 21, 2013

Dr. Roman's assessment covered July 13, 2012 to March 21, 2013. (R. 263). The medical disposition was that Plaintiff's impairments under Listing 12.04 Affective Disorders were not severe. (<u>Id.</u>). Dr. Roman found a medically determinable impairment is present that does not precisely satisfy the diagnosis criteria for 12.04 Affective Disorder Listing, specifically Plaintiff's depression, not otherwise specified. (R. 266).

Under the "B" Criteria of the Listings, Dr. Roman found that Plaintiff had mild limitations in his activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace with no episodes of decompensation. (R. 273). Dr. Roman further found Plaintiff did not meet any of the "C" Criteria of the Listings. (R. 274).

In his notes, Dr. Roman noted that the attorney representative reported no changes in Plaintiff's activities of daily living and no new sources since the initial level decision on July 12, 2012. (R. 275). He also referenced the psychological consultative examination in the file from February 7, 2013. (R. 275). He concluded "I have reviewed all the MER in the file and the initial assessment dated February 14, 2013 is affirmed as written. (<u>Id.</u>).

## C. Testimonial Evidence

At the ALJ hearing held on September 10, 2013, Plaintiff testified that his impairments included dermatomyositis, osteoarthritis, reflux, rheumatoid arthritis and osteoarthritis in his

knees. (R. 565, 569, 570). Plaintiff explained that dermatomyositis causes deposits underneath his fingers, swelling of muscles and rashes on his face, knees and hands. (R. 568). Plaintiff stated that the condition causes fatigue and muscle weakness and that it "turns my immune system against my body." (R. 569). He also testified regarding his pain, which is in his knees, back, hands shoulders and head. (R. 567). He also experiences weakness in his legs and arms. (R. 590). Plaintiff stated that he experiences headaches, approximately ten per month, for which he receives injections that cut the number of headaches in half. (R. 587). Plaintiff described his acid reflux condition, which affects his throat, results in a stomach ache after eating and causes bleeding and hemorrhoids. (R. 588). Plaintiff also stated that he has swelling in his extremities: his hands, feet, elbows and knees. (R. 589). The ALJ also reviewed Plaintiff's prior severe impairments as found by ALJ La Vicka, which included: polyarthritis, dermatomyositis, osteoarthritis in the knees, history of cruciate ligament and knee cartilage surgeries, shoulder and rotator cuff surgery, amyotrophic lateral sclerosis ("ALS" or "Lou Gehrig's disease"). Plaintiff argues that his dermatomyositis has gotten worse since ALJ La Vicka's decision in July 2012. (R. 556). Plaintiff testified that the only new condition would be his depression diagnosis, which was added by his family doctor at UHC Family Medicine. (R. 575). He further added that his symptoms include pain in his hands, knees and back, problems with fatigue, muscle weakness, headaches, depression, rheumatoid arthritis and stomach problems. (R. 556-57).

As for his mental conditions, Plaintiff testified that he was not seeing a psychiatrist or psychologist and was being treated by his family doctor for depression. (R. 566). Plaintiff stated "I talked to [my family doctor] about the depression, because I was having a lot of trouble with just crying a lot, and he suggested putting me on Cymbalta, and that helped me out a lot." (Id.). Plaintiff testified that he is not in any therapy counseling or seeing a psychologist because he

couldn't get approved for services. (R. 576). Plaintiff testified regarding his sleep problems and stated that he only sleeps for about three to four hours a night despite taking Ambien. (R. 581). Plaintiff also said his sleep is disturbed by his depression because he's "a worry wart." (Id.).

In regard to his medications, Plaintiff testified he was prescribed Prilosec/Debrox for gastroesophageal reflux disease, Prednisone for inflammation, Ambien for sleep, folic acid/Luvora, Tramadol for pain as need, Adderall for fatigue and Methotrexate for rheumatoid arthritis. (R. 566-67). Plaintiff testified that side effects include trouble sleeping, fatigue and headaches. (R. 565, 568). The Methotrexate shot specifically causes diarrhea for several days, fatigue and prevents Plaintiff from being in sunlight. (R. 589).

Plaintiff testified regarding his hospitalization and medical history. Plaintiff stated that he had surgery on his right knee in 2008, left knee in 2000, hernia surgery in his abdomen down to his groin in 2008, shoulder surgery in 2012 and a torn rotator cuff. (R. 570-71). Plaintiff stated that he was down to forty percent in his muscle in his shoulder and he attempted to do physical therapy when he tore it. (R. 571). Plaintiff testified that since his last ALJ hearing in June 2012, he had not undergone any surgeries but was hospitalized for IVIG treatment in April 2013, which involves plasma injections for his immune system issues. (R. 572). Plaintiff does not use a cane, crutch, wheelchair or braces. (R. 571).

Plaintiff also testified regarding his abilities and limitations. Plaintiff stated he could walk on ground level for about fifty yards, stand in one place for about five to ten minutes if he has something to lean on because of his knees. (R. 576). Plaintiff testified that he can bend forward, he cannot squat and he cannot lift his right arm over his head. (R. 579). As for lifting, Plaintiff stated he could lift twenty pounds below his waist but he cannot even lift a gallon of milk above his chest. (R. 580). As for sitting, Plaintiff stated that he has to keep his moving his leg because

of his knees and if his legs are in a locked position for a while, it is difficult for him to get up. (R. 580). Plaintiff testified that heat and overexertion result in breathing problems. (Id.). Plaintiff stated that his hands become "real stiff" and he "drops a lot of things." (R. 590).

Plaintiff testified regarding his daily activities. His home is one level with the garage in the basement. (R. 586). He is able to take care of his personal hygiene, such as showering, bathing and grooming. (R. 581). He can cook for a short amount of time but his seventeen year old daughter does most of the cooking. (R. 582). He can do laundry but at a very slow pace with it taking up to a day to do laundry and put the clothes away. (R. 582). As for household chores, Plaintiff's daughter does most of the cleaning, such as vacuuming and the heavier chores. (R. 582). When asked if his hands were full caring for his five-year old daughter, Plaintiff explained that she is enrolled in kindergarten and was in preschool the year prior. (R. 583). On a regular day, Plaintiff will "just lay around," take a hot shower or he can "hardly move," eats breakfast and then "just sit down and watch a lot of TV in the laid back recliner position." (R. 583). Plaintiff testified that he limits his driving to short distances. (R. 559). He usually naps once a day for about one to two hours. (R. 589). He does pick up his children from school sometimes but his daughter and the child's mother also helps. (R. 583-84). Plaintiff further stated he leaves the house to attend his children's sports games. (R. 586). He goes shopping once or twice a week. (R. 584). He does not have any hobbies or activities but prior to his conditions he used to play sports, exercise every day, lift weights, clean the house and yard work. (R. 584-85).

D.     **Vocational Evidence**

Also testifying at the hearing was Irene Montgomery a vocational expert. (R. 591). Ms. Montgomery characterized Plaintiff's past work as a pest control worker as light exertion but performed as very heavy by Plaintiff due to lifting over 100 pounds. (R. 592). With regards to

Plaintiff's ability to return to her prior work, Ms. Montgomery gave the following responses to

the ALJ's hypothetical:

> Q:    He has a high school education and the past work that you described, including his pest control license. The prior ALJ, in the record, which was used by the State Disability Determination Office in adopting the unfavorably [sic] analysis in the current claim was light work activity…Now accordingly to this, it's a light exertional level of work activity, with the following non-exertional limitations.
>
> A sit-stand options that allows an individual to briefly, for one to two minutes alternate sitting or standing at 30 minutes intervals without going off task. No more than occasional postural movements. Now, I assume what that means is, if it says, "except no climbing of ladders, ropes, and scaffolding," I'm assuming that that means occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling. Avoid concentrated exposure to the extreme heat and direct sunlight. Avoid all exposure to unprotected heights, hazardous machinery, and commercial driving. The work is limited to simple, routine, repetitive, making only simple decisions, free of fast-paced production requirements with few workplace changes. As taken from the record as Exhibit B1A. Looking at the work that you've described in terms of classification for Mr. Pierce, would an individual limited as I've just described be able to perform the work that Mr. Pierce did in the past?
>
> A:    No.

(R. 592-94). Incorporating the above hypothetical, the ALJ then questioned Ms. Montgomery

regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels:

> Q:    All right. Would there be examples of jobs that would exist in the national regional economy that would accommodate that hypothetical?
>
> A:    Yes. Based upon that hypothetical, I could suggest the following light and unskilled positions…The first position would be a weigher, scales operator…a cashier position, toll collector, parking garage…mall booth for examples…inspector position, such as medical products…
>
> Q:    …Let's take a look at the sedentary exertional level of work activity. Sedentary is [lifting] only 10 pounds occasionally, less than 5 pounds on a frequent basis. Standing and walking is only require [sic] two hours out of an eight hour day. Sitting up to six to eight hours with normal breaks. Now, of course, the other no climbing of any ladders, ropes or scaffolding. Only occasionally ramps and stairs. Balance, stoop, knee, crouch, and crawl. Avoid overhead reaching with the right upper extremity. Avoid concentrated exposure to temperature extremes, vibration,

as well as hazards. The hazards are working around moving plant machinery, and unprotected heights. And the limitation is to only unskilled work, routine, repetitive with no rapid production quotas. In other words, a low stress. At the sedentary level would there be examples of jobs that would satisfy the requirements of the hypothetical in the same region that you previous [sic] defined?

A:    Yes. Based on that hypothetical, I could suggest the following sedentary and unskilled positions. Preferred to be a document preparer…an order clerk position…an addresser, mail sorter position.

(R. 594-96). Finally, the ALJ questioned Ms. Montgomery about Plaintiff's ability to work if he is completely credible as to the severity of his conditions:

Q:    And assume that I find that a person with the residuals that he deals with from the dermatomyositis, the osteoarthritis, and the surgeries he's had on his knees and arms and shoulder, would cause a person to reach a level of mark with respect to attention, concentration and pace. A person with marked deficiencies in attention, concentration and pace, would not be able to complete a full eight hour work day, five days a week, for 40 hours. Such a person would be off task more than 10 percent of the work day. For purposes of my hypothetical, I'm contemplating a third or more of the eight hour work day. As he indicated, there would be bad days. Bad days are paid residuals, and issues relating to the side effects form his medications, which would cause absences from work, and for unskilled work, as I understand it, there has to be more than two. I'm thinking more, on average, once a week or four, in a thirty day work period. If that would be the case, Ms. Montgomery, would there be any jobs you could identify?

A:    No. Not on a full time basis.

(R. 596-97). Plaintiff's attorney then questioned Ms. Montgomery:

Q:    Ms. Montgomery, regarding the jobs you listed for light and sedentary work, if the hypothetical person were to only have occasional use of their bilateral hands, would those jobs remain?

A:    Assuming that the individual would only have occasional use for fine fingering, that would compromise the positions on a full-time basis, at both the light and the sedentary levels.

(R. 598).

## E.     Lifestyle Evidence

On an adult function report dated January 3, 2012, Plaintiff stated that he has no strength or stamina, is very weak in his shoulders and legs, requires days of rest after being active, cannot be in the heat or sunshine, cannot sit for very long, his methotrexate treatment make him very tired for two to three days and because his illness affects his eyes and skin, he is uncomfortable being around people in public. (R. 162). Plaintiff's typical day involves sometimes eating breakfast, brushing his teeth and showering, watching television, occasionally picking up his children from school at 2:30 p.m., watching television, sometimes fixing dinner in the microwave, watching television and then going to bed. (R. 163). Plaintiff reported that his seventeen year old daughter helps to care of his younger children. (R. 163). Plaintiff stated he needs reminders for taking his methotrexate shot and folic acid medicine once a week. (R. 164).

As for meals and household chores, Plaintiff explained that he is limited to preparing frozen meals in the microwave, he does little laundry, no yard work and his daughter does most of the housework. (R. 164). Plaintiff stated he goes outside about once a day for short periods of time and he is able to drive and ride in a car. (R. 165). Plaintiff shops for groceries about once every week but he relies on his sister or daughter to go to the store more often if needed. (R. 165). Plaintiff stated that his ability to handle money has changed as he misses dates bills are due and sometimes over draws his account. (R. 166).

In regard to hobbies, interests and social activities, Plaintiff stated he used to exercise every day, play basketball and softball and work six days a week. (R. 166). As a result of his conditions, Plaintiff no longer engages in these activities and his hobbies are limited to watching television. (R. 166). Plaintiff participates in family dinners for holidays and birthdays but his illness affects his skin and face and makes him not want to go around others or strangers. (R.

166). Plaintiff will go to Walmart and to his children's activities when he is feeling well enough. (R. 166). Plaintiff stated he does not have problems getting along with others but it is hard to be around people because of his illness, which affects his skin and face; he also stated that he is "just depressed." (R. 167).

As for his abilities, Plaintiff stated he cannot lift over thirty pounds above his shoulders, squatting hurts his knees, bending hurts lower back, standing hurts feet, knees, kips and back, reaching hurts his shoulder, long walking makes it hard to breathe, his hips, hands are swollen and wore, and it takes extra concentration for him to do things. (R. 167). Plaintiff noted that his conditions affect his memory, concentration, understanding and his ability to complete tasks and follow instructions. (R. 167). Plaintiff stated he can pay attention for about five minutes before needing to refocus and when following written instructions he has to keep going over the instructions. (R. 167). Plaintiff further noted his ability to follow spoken instructions was "sometimes good." (R. 167). Plaintiff stated he gets along with authority figures well but his medications make him have a short temper. (R. 168). Plaintiff stated he had been fired or laid off from a job because of problems getting along with his new boss at Terminix. (R. 168).

Plaintiff further stated that he does not handle stress well and that the stress makes him depressed and his illness worse. (R. 168). Plaintiff stated that he does not handle changes in routine very well and it makes him feel anxious. (Id.). He further noted unusual behaviors or fears because he is depressed "all the time" and cries "over just the littlest things." (Id.).

As for side effects of his medications, Plaintiff reported that his medications, particularly Methotrexate, makes him "depressed a lot on top of already being depressed from not working, no income and being sick for two years." (R. 169). Plaintiff also noted that his medications cause moodiness and tiredness. (R. 169).

Plaintiff also completed various disability reports for the SSA. (R. 170-81). Since March 14, 2013, Plaintiff reported increased arthritis pain and more depression. (R. 177). Plaintiff also noted that personal tasks take longer to complete and he cannot cook, clean or do yard work. (R. 179). He further noted that he cannot reach above his head, lift or carry anything. (Id.). He also reported that side effects from his medications included constipation, drowsiness, high headiness, dizziness, swelling and insomnia. (R. 172).

## IV. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

17

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V. ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. **The claimant meets the non-disability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits throughout the "period at issue" herein, i.e., since July 13, 2012.**

2. **The claimant has not engaged in "substantial gainful activity" at any since at least [sic] October 14, 2010 (20 CFR 404.1520(b) and 416.920(b)).**

3. **During the period at issue, the claimant has evidenced the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: polyarthritis; osteoarthritis of the knees with history of anterior cruciate ligament and knee cartilage surgeries; history of right rotator cuff/shoulder surgery; dermatomyositis; inflammatory myopathy; mood disorder associated with medical condition (dermatomyositis); and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).**

4. **During the period at issue, the claimant has evidenced no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in**

Appendix 1, Subpart P, Regulation No. 4 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Throughout the period at issue, the claimant has had at least the residual functional capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion, with lifting/carrying of no more than 10 pounds occasionally and less than 5 pounds frequently, sitting of up to 8 hours and standing/walking no more than 2 cumulative hours within an 8-hour workday; requires no climbing of ladders, ropes or scaffolds and no more than occasional performance of other postural movements (i.e., balancing, climbing of ramps or stairs, crawling, crouching, kneeling and stooping); requires no overhead reaching with the dominant (right) upper extremity; entails no concentrated exposure to temperature extremes or vibration and no exposure to hazards (e.g., dangerous moving machinery, unprotected heights); and is limited to "unskilled," simple, routine and repetitive tasks that impose no rapid production quotas or significant stress (20 CFR 404.1520(e), 404.1567(a), 416.920(e), 416.967(a)).

6. Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of his "vocationally relevant" past work as sales agent for pest controls (20 CFR 404.1565 and 416.965).

7. The claimant is considered for decisional purposes as a "younger individual age 18-44" (20 CFR 404.1563 and 416.963).

8. The claimant has attained a "high school" education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. The claimant has a "skilled/semi-skilled" employment background but acquired no particular work skills that are transferable to any job that has remained within his residual functional capacity to perform during the period at issue (Social Security Ruling 82-41, and 20 CFR 404.1568 and 416.968, and Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, level of education, work experience and residual functional capacity, he has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR 404.1560(c), 404.1566, 416.960© and 416.966).

(R. 19-25).

# VI. DISCUSSION

## A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.  1987).

## B.    Contention of the Parties

Plaintiff, in his motion for summary judgment, asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence." (Pl.'s Mot. at 1, ECF No. 13).  Specifically, Plaintiff alleges just one narrow issue: "[w]hether the ALJ committed

reversible error in failing to properly evaluate the claimant's mental impairment and resulting functional limitations as required by 20 C.F.R. § 404.1520a and 416.920a." (Pl.'s Br. in Supp. of J. on the Pleadings ("Pl.'s Br.") at 2, ECF No. 13-1). Plaintiff contends that the ALJ's findings are so confusing that it makes it "nearly impossible to follow the ALJ's reasoning in this case" because at step two of the sequential evaluation process the ALJ found Plaintiff's mental impairments to be severe and not severe. (Pl.'s Reply at 1). Next, Plaintiff explains that if Plaintiff's mental impairments were found to be severe, then the ALJ was required at step three to analyze whether those impairments met or equaled the Listings. (Pl.'s Br. at 6). In essence, Plaintiff argues that the ALJ skipped a step with regard to Plaintiff's mental impairments by failing to analyze the conditions under the Mental Disorder Listings paragraph "B" and "C" criteria. (Pl.'s Reply at 3). Plaintiff asserts that "remand is warranted in this case given the ALJ's contradictory findings regarding the severity of Plaintiff's mental impairments and his failure to follow the special technique required in the evaluation of severe mental impairment at step three of the sequential evaluation process." (Id. at 7).

Defendant, in her motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1, ECF No. 14). Specifically, Defendant alleges that the ALJ did not err in finding that Plaintiff's medically determinable mental impairments were not "independently" severe." (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 5, ECF No. 15). In addition, the ALJ thoroughly explained his rationale for concluding that Plaintiff's mental impairments were not severe. (Def.'s Br. at 5). In finding at least one severe impairment, the ALJ then proceeded to the next step of the sequential evaluation process so there is "no material deficiency at step two." (Def.'s Br. at 11). Further, "[b]ecause Plaintiff's mental impairments were not severe, the ALJ did not

provide a discussion of whether those impairments met the listings." (Def.'s Br. at 7). Therefore, Defendant argues the Commissioner's decision that "Plaintiff was not disabled is supported by substantial evidence." (Def.'s Br. at 15).

In Plaintiff's Reply, he again requests the Court reverse and remand the case due to the ALJ's confusing findings at step two of the sequential evaluation process regarding Plaintiff's mental impairments and then the ALJ's failure to consider Plaintiff's mental impairments pursuant to the Listings analysis at step three.

**C.    Analysis of the Administrative Law Judge's Decision**

Plaintiff's only assignment of error is that the ALJ failed to properly evaluate Plaintiff's mental impairments. The undersigned first addresses Plaintiff's contention regarding the ALJ's findings at step two of the sequential evaluation process and then discusses whether the ALJ erred by failing to determine if Plaintiff's mental impairments met or equaled a Listing.

**1.    Step Two Analysis Regarding Plaintiff's Mental Impairments**

At step two of the sequential evaluation, the claimant bears the burden of production and proof that he had a severe impairment. Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983). To be "severe," an impairment or combination of impairments must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Any impairment must result from abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508. Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509. Moreover, a mere

diagnosis of a condition is insufficient to prove disability; instead, there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). Furthermore, "[t]he severity standard is a slight one in this Circuit." Stemple v. Astrue, 475 F. Supp. 2d 527, 536 (D. Md. 2007). "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

In the present case, Plaintiff argues that the ALJ erred at step two of the sequential evaluation process by finding that Plaintiff had two mental impairments that were severe (i.e., mood disorder associated with medical condition (dermatomyositis) and generalized anxiety disorder) but then finding that Plaintiff did not have any "independently 'severe' psychological impairment(s)." (Pl.'s Br. at 5-6). The ALJ then found that Plaintiff had "physical impairment-related symptoms" that resulted in moderate limitations to Plaintiff's abilities as to concentration, persistence and pace but clarified that these limitations were "attributable in significant part to *physical* impairment-related symptoms, as opposed to any intractable, clearly-evident *mental* illness(es)." (R. 21). Plaintiff argues that such a finding is "so confusing" that it is "nearly impossible to follow the ALJ's reasoning." (Pl.'s Reply at 1-2). Defendant argues that the "ALJ thoroughly explained his rationale for concluding that Plaintiff's mental impairments were not severe." (Def.'s Br. at 5).

At step two of the sequential evaluation process, ALJ Mills made a finding, typed in bold font, regarding whether the "claimant has evidenced the following medically determinable impairments that, either individually or in combination, are 'severe' and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive

months." (R. 19). The ALJ then lists "mood disorder associated with medical condition (dermatomyositis); and generalized anxiety disorder" as severe impairments. (R. 19).

Following this finding in bold font, ALJ Mills provides a detailed explanation of his step two determination. (R. 19-21). In regard to Plaintiff's mental conditions, ALJ Mills explains that he "has included as 'medically determinable' impairments several psychiatric diagnoses that were rendered after the date" of the ALJ La Vicka's unfavorable 2012 decision. (R. 20). ALJ Mills clearly states that "such conditions/disorders are not herein found to be independently severe." (R. 20). While this appears to contradict the ALJ's finding highlighted in bold on the previous page, a review of the ALJ's analysis makes clear that the ALJ did not consider Plaintiff's mental conditions, the mood disorder and generalized anxiety disorder, to be severe impairments. As such, the undersigned finds that the ALJ inclusion of Plaintiff's mood disorder and generalized anxiety disorder as severe impairments in one sentence on page nineteen is harmless error. "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate disability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error…is fully applicable to judicial review of administrative decisions."); Hurtado v. Astrue, C/A No. 1:09-1073-MBS-SVH, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("[T]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision."). The error is harmless because in the substance of the ALJ's decision, he stated and provided ample support for his finding that Plaintiff's mental impairments were not severe, proceeded in the sequential evaluation process and was cognizant of these disorders when formulating his RFC finding.

The ALJ provided a thorough analysis explaining his finding that Plaintiff's mental impairments were not severe. The ALJ discusses Plaintiff's consultative psychological evaluation by Peggy Allman, M.A. on February 7, 2013, which included diagnoses for mood and anxiety-related disorders but also noted that claimant's social functioning, concentration, persistence and pace all were within normal limits. (R. 20). The ALJ then discusses Ms. Allman's examination findings, including a review of Plaintiff's daily activities, his conversational tone and interaction with the examiner, his ability to get along well with others and the fact that he has never been involved in the "mental health system." (R. 20). The ALJ also notes that "the claimant complained of no mental illness(es) in conjunction with his prior or current disability benefit applications. (R. 20-21).

ALJ Mills then concludes:

> the undersigned is unable to conclude that the claimant has objectively evidenced any independently "severe" psychological impairment(s) during the period at issue, i.e., any psychological conditions that, either individually or in combination, have imposed more than "mild," if any, limitations upon his ability to carry out daily activities, or his abilities as to social functioning, or his abilities as to concentration, persistence or pace, or that has resulted in or its likely to result in any repeated episodes of decompensation (20 C.F.R. §§ 404.1520a and 416.920a). Such findings are consistent with those made by Judge La Vicka in the July 2012 hearing decision, and are consistent with and supported as well by the subsequent, February and March 2013 respective assessments of David Allen, Ph.D. and Frank Roman, Ed.D., the State Agency's psychological consultants.

(R. 21). Next, the ALJ clarified that while he found Plaintiff's mental impairments to not be independently severe, he did find some limitations regarding Plaintiff's concentration, persistence and pace that were attributable to his physical conditions. The ALJ explains:

> as indicated by the functional limitations ascribed hereinafter, the ALJ has found the claimant to have 'moderate' impairment-related limitation with regard to his abilities as to concentration, persistence and pace that is attributable in significant part to *physical* impairment-related symptoms, as opposed to any intractable, clearly-evident *mental* illness(es). Such symptoms, considered in conjunction with

the claimant's 'mildly' debilitating psychological conditions, are found to warrant accommodation by limiting work performance to relatively simple, routine activities and tasks.

(R. 21). Accordingly, at step two of the sequential evaluation process, the ALJ found Plaintiff's mental impairments to be non-severe. However, the ALJ found Plaintiff's concentration, persistence and pace to be "moderately" limited as a result of his physical conditions and such limitations were appropriately incorporated into Plaintiff's RFC.

While Plaintiff argues that the ALJ's reasoning is so confusing that it is impossible to follow, after careful review of the ALJ's decision and the evidence of record, the undersigned is not similarly confounded by the ALJ's findings or reasoning. Even though the ALJ included "mood disorder associated with medical condition (dermatomyositis); and generalized anxiety disorder" as impairments that are either individually or in combination "severe" in his bold findings on page nineteen of the decision, the ALJ's lengthy explanation on pages twenty and twenty-one make clear that the ALJ did *not* find such conditions/disorders to be independently "severe" psychological impairments. (R. 20, 21). The ALJ thoroughly explained his finding, including an analysis of Ms. Allman's consultative examination, the fact that Plaintiff had not been involved in the "mental health system" nor complained of mental illnesses in his prior or current disability benefit applications. (R. 20). The ALJ specifically noted that Plaintiff had no more than mild, if any, limitations on his ability to carry out daily activities or abilities as to social functioning, concentration, persistence or pace and no episodes of decompensation. (R. 21). The ALJ then reasoned that these findings were consistent with ALJ La Vicka's 2012 opinion and consistent and supported by the 2013 assessments of State Agency psychological consultants, David Allen, Ph.D. and Frank Roman, Ed.D., both of which found Plaintiff's mental impairments to be not severe. (R. 21; R. 467; R. 263). Despite the classification of the mood

26

disorder and generalized anxiety disorder as severe impairments on page nineteen, a review of the ALJ's detailed analysis demonstrates that the ALJ did not find Plaintiff's mental impairments to be severe. Moreover, the undersigned finds that the ALJ did not err in ultimately finding that Plaintiff does not have an independently "severe" psychological impairment and substantial evidence supports this finding.

In addition, a failure by the ALJ to specifically find that Plaintiff's mental impairments are severe would not, on the record before the Court, constitute reversible error. A step two error is harmless if the ALJ "continued through the remaining steps and considered all of the claimant's impairments." Syms v. Astrue, No 10-CV-499-JD, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011); see also Mauzy v. Astrue, No. 2:08-CV-75, 2010 WL 1369107, at *6 (N.D. W. Va. Mar. 30, 2010) (finding that it was "not reversible error for the ALJ not to designate any of the plaintiff's other medical conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments"); see also Pompa v. Comm'r of Soc. Sec., 73 F. App'x 801, 803 (6th Cir. 2003) (explaining that "[b]ecause the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence. As the ALJ considered all of Pompa's impairments in her residual functional capacity assessment finding, Pompa's argument is without merit.").

Here, the ALJ evaluated Plaintiff's degree of limitation pursuant to 20 C.F.R. § 1520a and concluded that Plaintiff only had "mild, if any, limitations" in the four broad functional areas. (R. 21). The ALJ then considered Plaintiff's "moderate" limitations with regard to his abilities as to concentration, persistence and pace, which the ALJ attributed in significant part to his physical conditions, along with Plaintiff's "mildly" debilitating psychological conditions, to

27

"warrant accommodation by limiting work performance to relatively simple, routine activities and tasks" in Plaintiff's RFC. (R. 21). Accordingly, the undersigned finds no error in the ALJ's decision regarding Plaintiff's mental impairments at step two of the sequential evaluation.

## 2. Step Three Analysis Regarding Whether Plaintiff's "Severe" Mental Impairments Meet or Equal a Listing

When a claimant has a "severe," medically determinable impairment or a combination of medically determinable impairments that are "severe," the sequential analysis proceeds to the third step. 20 C.F.R. § 404.1520(a)(4). At the third step, the ALJ determines "whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity." Bowen v. Yuckert, 482 U.S. 137, 141 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Part 404, Subpart P, Appendix 1. The plaintiff bears the burden of proving that he meets all of the requirements of a Listing. See 20 C.F.R. §§ 404.1512(a), 404.1525(c)(3), 416.912(a), 416.925(c)(3). As explained by the United States Supreme Court, the Listing of Impairments is intentionally designed to be a more rigorous standard of disability:

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.' The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (internal citations omitted). When evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the

relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). "Cook, however, does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." Russell v. Chater, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (unpublished opinion). The ALJ's duty of explanation is satisfied when he provides findings and determinations sufficiently articulated to permit meaningful judicial review. See DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

Here, the ALJ proceeded to the third step and considered whether Plaintiff's medically determinable impairments met or equaled a Listing. (R. 21). However, Plaintiff argues that the ALJ erred by failing to specifically consider whether Plaintiff's "severe" mental impairments met or equaled a Listing as required by 20 C.F.R. § 420.1520a. (Pl.'s Br. at 6). Defendant argues that "[a]fter fully evaluating Plaintiff's non-severe mental impairments, the ALJ concluded that none of Plaintiff's severe impairments met or equaled a listed impairment. Because Plaintiff's mental impairments were not severe, the ALJ did not provide a discussion of whether those impairments met the listings." (Def.'s Br. at 7).

In the present case, the ALJ found that "the claimant has evidenced no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4." (R. 21). The ALJ stated that he:

> appropriately evaluated medical and other evidence pertaining to the claimant's medically determinable impairments in conjunction with all relevant severity criteria contained within 1.00 Musculosketal System (including listing 1.02 Major dysfunction of a joint(s) due to any cause and 1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), 11.00 Neurological and 14.00 Immune System Disorders.

(R. 21). Plaintiff is correct that the ALJ did not specifically mention a mental impairment listing, however, this failure is not reversible error as Plaintiff contends.

As discussed above, the ALJ found that Plaintiff's mental impairments were not independently "severe" psychological impairments. (R. 20, 21). The ALJ rated the degree of functional limitation[1] pursuant to 20 C.F.R. §§ 404.1520a and found that Plaintiff's mental impairments only resulted "in 'mild,' if any, limitations upon his ability to carry out daily activities, or his abilities as to social functioning, or his abilities as to concentration, persistence or pace, or that has resulted in or is likely to result in any repeated episodes of decompensation." (R. 21). The Social Security regulations explain that "[i]f we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe." 20 C.F.R. § 404.1520a(d)(1). Here, the ALJ found that Plaintiff's degree of functional limitation in each of the functional areas was "mild, if any," and further concluded that Plaintiff's mental impairments were not independently "severe." (R. 21). By finding that Plaintiff's mental impairments were not severe, the ALJ was not required to determine whether the impairment met or equaled a listed mental disorder. See 20 C.F.R. §§ 404.1520a(d)(2) (explaining that "[i]f your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder.").

Moreover, the undersigned finds that Plaintiff has failed to carry his burden in establishing that he meets a Listing. A district court in the Fourth Circuit has noted that "[u]nder

---

[1] The Social Security Regulations outline the process for the evaluation of mental impairments using a special "technique." 20 C.F.R. § 404.1520a. First, the ALJ must evaluate "pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). Then, the ALJ must rate the degree of functional limitation resulting from the impairments. 20 C.F.R. § 404.1520a(b)(2). "When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more." 20 C.F.R. § 404.1520a(c)(4).

30

Cook, the duty of identification of relevant listed impairments and comparison of symptoms to Listing criteria is only triggered if there is *ample evidence* in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments." Ketcher v. Apfel, 68 F. Supp. 2d 629, 645 (D. Md. 1999) (emphasis added); see also Richardson v. Comm'r of Soc. Sec., No. SAG-13-468, 2014 WL 996860, at *2 (D. Md. Mar. 12, 2014) (applying the "ample evidence" standard from Ketcher); see also Parker v. Astrue, No. 5:10-CV-395-D, 2011 WL 2981867, at *4 (E.D.N.C. June 16, 2011), adopted by 2011 WL 2975922 (E.D.N.C. July 22, 2011) (stating that "[w]hile the ALJ did not reference this listing specifically, his finding that plaintiff lacks an impairment or combination of impairments that meets or medically equals any listing encompasses Listing 4.11.").

The evidence in this case does not support a determination that Plaintiff's mental impairments met or equaled one of the listed mental disorders. Moreover, Plaintiff fails to argue or point to evidence that demonstrates he met or equaled a Listing nor does Plaintiff suggest which Listings the ALJ failed to consider. The undersigned thoroughly reviewed the medical evidence in this case and there is no documentation that Plaintiff reported any mental symptoms or conditions that interfere with his ability to function independently, appropriately, effectively, and on a sustained basis. See 20 C.F.R. § 404.1520a(c)(2). Only one treating source physician, Dr. Kumar, diagnosed Plaintiff with a mental condition, which he described as a "mild depressed mood." (R. 354). Plaintiff was prescribed Cymbalta, which he stated at the administrative hearing has "helped me out a lot." (R. 566). Given that there is ample evidence in the record to support a determination that Plaintiff's mental impairments did not meet or equal the Listings, including Listing 12.04 Affective Disorders or 12.06 Anxiety-related disorders, the undersigned finds that the ALJ did not err by failing to discuss a listed mental disorder in his decision.

# VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for DIB and SSI is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 12th day of December, 2014.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE